**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.          14-cv-2231

Jonathan SHIELDS,
          **PLAINTIFF**
v.

Jennifer DUNCAN (personal and official capacities as Plaintiff's parole officer); Marcelo KOPCOW (official capacity as SOMB Board Member), Erin JEMISON (official capacity as the SOMB Board Chair), Mary BAYDARIAN (official capacity as SOMB Board Member), Carl BLAKE (official capacity as SOMB Board Member), Allison BOYD (official capacity as SOMB Board Member), A. Mervyn DAVIES (official capacity as SOMB Board Member), Cheryl DAVIES (official capacity as SOMB Board Member), Jessica CURTIS (official capacity as SOMB Board Member), Amy FITCH (official capacity as SOMB Board Member), Jeff GEIST (official capacity as SOMB Board Member), Missy GURSKY (official capacity as SOMB Board Member), Peggy HEIL (official capacity as SOMB Board Member), William HILDEBRAND (in his official capacity as SOMB Board Member), Nancy JOHNSON (official capacity as SOMB Board Member), Jeff JENKS (official capacity as SOMB Board Member), Dianna LWYER-BROOK (official capacity as SOMB Board Member), Tom LEVERSEE (official capacity as SOMB Board Member), Richard BEDNARSKI (official capacity as SOMB Board Member), John ODENHEIMER (in his official capacity as SOMB Board Member), Jessica MEZA (official capacity as SOMB Board Member), Angel WEANT (official capacity as SOMB Board Member), Mimi SCHEUERMANN (official capacity as SOMB Board Member), Doug STEPHENS (official capacity as SOMB Board Member),  Brandon SHAFFER, (official capacity as Colorado Parole Board Member), Rebecca OAKES, (official capacity as Colorado Parole Board Member), Denise BALAZIC (official capacity as Colorado Parole Board Member), Joe MORALES (official capacity as Colorado Parole Board Member), John O'DELL (official capacity as Colorado Parole Board Member), Alfredo PENA (official capacity as Colorado Parole Board Member), Marjorie LEWIS (official capacity as Colorado Parole Board Member),
          **DEFENDANTS**

---

**COMPLAINT FOR DAMAGES, DECLARATORY and INJUNCTIVE RELIEF
and JURY DEMAND**

---

The Plaintiff, by and through his attorney, Alison Ruttenberg, submits is Complaint against the Defendants.

## JURISDICTION OF THE COURT

1.      This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 USC §1983.  Jurisdiction is conferred on this Court pursuant to Title 28 USC §1331.  Jurisdiction supporting the Plaintiffs' claim for attorney fees and costs is conferred by 42 USC §1988.

2.   Venue is proper in the District of Colorado pursuant to 28 USC §1391(b).  All of the events relevant to the claims set forth in this Complaint occurred within Jefferson and Denver Counties, Colorado.

## PARTIES, PARTICIPANTS AND FACTS

3.   At all times material to this Complaint, the Plaintiff was a citizen of Colorado who was born on November 6, 1984.  His parents live in Colorado, are not his "victims" or co-defendants and do not have a criminal record.

4.      Jennifer Duncan is a Department of Corrections Community Parole Officer, and has been the Plaintiff's parole officer from 2012 to the present.  She is sued in her personal capacity for damages, and in her official capacity for prospective injunctive and declaratory relief.  At all times material to the allegations in this complaint, she was acting under color of state law.

5.      The Parole Board Members are sued in their official capacity for prospective injunctive and declaratory relief.  The parole board members act under color of state law when they parole offenders such as the Plaintiff upon

2

certain terms and conditions and/or move to revoke the parole of offenders such as the Plaintiff.

6.    The SOMB Defendants are the board members and chair of the Colorado Sex Offender Management Board ("SOMB").  They are sued in their official capacities for injunctive and declaratory relief; and when promulgating standards and guidelines or otherwise instructing probation and parole officers and community treatment providers, they are acting under color of state law.

a.    In 1992, the Colorado General Assembly passed legislation that created the SOMB in the Division of Criminal Justice. The SOMB was charged to develop standards and guidelines for the evaluation, treatment, and behavioral monitoring of sex offenders. Currently, the SOMB consists of personnel representing the following domains: the department of corrections, the judicial department, law enforcement, the public defender's office, private criminal defense attorneys, rural and urban county commissioners, clinical polygraph examiners, the department of public safety, district attorneys, department of human services, licensed mental health professionals with expertise in treating sex offenders, the victim services community, and community corrections.  The General Assembly created the SOMB as a means of managing the evaluation and treatment of sex offenders. *People v. Brosh*, 251 P.3d 456, 460 (Colo. App. 2010); CRS 16-11.7-103(1). Among other things, the SOMB is tasked with "develop[ing], implement[ing], and revis[ing], as appropriate, guidelines and standards to treat adult sex offenders."   CRS16-11.7-

3

103(4)(b).

b.    The SOMB has promulgated a document called "standards and guidelines for the assessment, evaluation, treatment and behavioral monitoring of adult sex offenders;" hereinafter referred to as the "SOMB guidelines." The SOMB guidelines apply to sex offenders who meet the SOMB definition of a "sex offender," and there is no authority in the guidelines for applying the guidelines to any other offender that does not meet the definition.    Despite being called "guidelines," parole and probation officers, and community and DOC treatment providers interpret the promulgations of the SOMB as having the force and effect of a statute. The SOMB "guidelines" are poorly researched, not based on peer-reviewed scientific research and are largely based on Defendant Peggy Heil's personal publications, which are not peer reviewed and/or based on publications by victim's advocacy groups. Heil has little support for many of her assertions, and will (for example) cite to having seen something on a poster at a seminar as "authority" for what is set forth in the SOMB guidelines.

c.    The SOMB is the final policymaking authority for the state of Colorado regarding the treatment and behavioral monitoring of sex offenders, whether on probation, on parole or confined in the Colorado Department of Corrections.

d.    Last Fiscal Year, the General Assembly ordered the Department of Corrections to engage an independent evaluation team to

4

thoroughly evaluate the sex offender treatment program.  The report by the independent evaluators was released on February 1, 2013 and is a highly critical condemnation of Colorado's sex offender treatment program and applies equally to the community based treatment providers that treat the probationers and parolees and the treatment providers that provide treatment to DOC inmates.  In particular, this independent evaluation condemned the "one sized fits all" policy of the SOMB of treating all sex offenders alike, without regard to the age and gender of the offender or the age, gender or number of alleged victims or the nature of the offense or whether violence or a weapon was used in the commission of an offense.  This "one sized fits all" policy treats all sex offenders as serial pedophiles, who place all children in the community at risk of sexual assault, without regard to whether a particular offender has ever committed a sex assault on a child or even has pedophiliac tendencies.

7.      The SOMB has promulgated policies for the treatment of sex offenders at the DOC and while in community treatment programs on probation or parole.

### FACTUAL BACKGROUND

8.      The Plaintiff is a juvenile offender who was charged as an adult with various third class and fourth class sex offense and other felonies, in Adams County District Court case 2005CR1163, for actions against his cousins that allegedly took place in 2002 when he was seventeen.   The Attorney General's office takes the disingenuous position that the Plaintiff is not a juvenile offender

5

because he no longer is a juvenile, and was not a juvenile when he was sentenced.  This is factually and legally incorrect; Mr. Shields is a juvenile offender within the meaning of *Miller v. Alabama,* 132 S.Ct. 2455 (2012), *Jackson v. Hobbs*, 132 S.Ct. 548 (2012), *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010) and *Roper v. Simmons*, 543 U.S. 551 (2005).

9.    The Plaintiff was a developmentally disabled child who always had to have Individual Education Plans in public school, and had to drop out of High School and obtain his GED because of academic difficulties.  Then, Plaintiff was hit by a car while riding on his bicycle in 2001 and he suffered severe brain damage.  The charges in the case at bar arose the summer after this accident when the Plaintiff was hired by a relative to babysit his younger cousins.  While at his cousin's house, he was repeatedly given marijuana by his cousins' father.  There was evidence that these young cousins were being physically abused by their father, but the young cousins made various allegations against the Plaintiff.  Some of these allegations were rather fantastical allegations involving anal penetration and threats to kill the family dog and other (human) family members.

10.    One of the alleged victims have since recanted and confirmed that the allegations against Plaintiff were all fabricated.  However, in March 2006, the young, frightened, brain damaged Plaintiff pleaded guilty to one Fourth Class Felony Sex Assault against a Child and a Misdemeanor Sex offense in exchange for a deferred sentence.  Upon information and belief, the District Attorney knew that the retaliation charges (involving the alleged threats to kill the dog and other family members) were all fabricated, and dismissed these charges.  The District

Attorney took the unusual step of writing a written memorandum to the Judge outlining the terms of the deferred judgment and that it was fair to dismiss the retaliation charges.   Unfortunately, the brain damaged Plaintiff was unable to successfully complete the deferred judgment, it was revoked and he was resentenced to an indeterminate sentence of two years to life in the DOC on December 6, 2012.

11.    At the DOC, the Plaintiff is one of the few sex offenders, sentenced as an adult pursuant to the lifetime supervision act, who was able to successfully complete sex offender treatment prior to 2011, and the Plaintiff was paroled in early 2012.   While in the DOC, the Plaintiff was given an "issue specific" polygraph allegations regarding the questionable allegations that he committed forcible sodomy and threatened to kill the alleged victim's dog and family members.   He denied engaging in any anal sexual contact, threatening anyone with a firearm, forcible sexual contact or threatening his cousins that he would kill their dog or family members.   He passed this polygraph examination with no deception.   However, the Attorney General's Office and the Defendants continue to harp on and resurrect these false and fabricated allegations of threats with a firearm, forcible sodomy and threatening to kill dogs and family members.   The Attorney General's Office and the Defendants take the inconsistent position that anytime a sex offender passes an "issue specific" polygraph examination that the results can be ignored as false negatives, but anytime a sex offender fails a sexual history or maintenance polygraph, that these results are conclusive proof of misconduct.

7

12.     When the Plaintiff was paroled in 2012, Defendant Jennifer Duncan was assigned to be his parole officer.  The Plaintiff was paroled to his mother's house, and moved into his little brother's bedroom.  Plaintiff was cleaning it up, removing trash and other former belongings of his brother.  In this room was a cell phone with a free month service as a promotion that his brother had been using.  The Plaintiff did improperly use this phone to text, but did not know that his brother had been using this phone to view websites that could be considered pornographic.  The text messages Plaintiff sent revolved his efforts to obtain a job at his friend's mother's tow truck company.  His friend was an approved contact.  Plaintiff's brother used that cell phone to take a "selfie" of himself and the Plaintiff when the Plaintiff was released from the DOC.  Duncan arrived at Plaintiff's mother's house to search it shortly after Plaintiff's arrival on parole. She seized the phone, and noted that a friend of the family, who had shown up minutes prior to Duncan's arrival, had a felony record.  The Plaintiff did not know that this family friend had a felony record and had no control over who came to his mother's house.  Duncan arrested him in June 2012 and sought to revoke his parole over this telephone and unauthorized contact with another felon.  This was before Plaintiff could even be enrolled into sex offender treatment in the community.  Duncan argued to the Parole Board hearing officer that Plaintiff had a poor attitude and did not care.  Duncan, like the other Defendants and the Attorney General's office, have been consistent in ignoring the Plaintiff's brain damage, which means that he is easily overwhelmed.  It is difficult for the Plaintiff to move efficiently through a "to do" list of tasks.  Plaintiff knew he had to clean

8

up his brother's room, remove unauthorized items, and so forth, but he was not moving quickly enough for Ms. Duncan. The Parole Board hearing officer rejected Ms. Duncan's request to revoke his parole and remand him to the DOC and reinstated Plaintiff's parole.

13. The Plaintiff entered sex offender treatment, and entered the community for the first time as an adult. He had been incarcerated from 2006 (when he was 20) until 2012. As a result, he had few life skills, and had to learn the basics such as how to manage his time, figure out public transportation and budget his money. His brain damage made learning those basic life skills more difficult. He was also exposed, for the first time, to the adult world of sexual attraction, flirtation and dating. He met a woman on the bus, who turned out to be a bit of a stalker, who became jealous and angry when he spurned her advances after an initial flirtation. This woman placed numerous "anonymous" phone calls to Duncan and other parole officers regarding the Plaintiff, and Duncan and her colleagues falsely claimed to the parole board that they were receiving "multiple" complaints regarding the Plaintiff as if multiple members of the community were making these allegations. Instead, it was just this one woman making the calls.

14. The Plaintiff struggled financially after he lost his job in 2013 and was no longer able to pay for sex offender treatment. Duncan ordered him to be placed in "Phoenix House," a half way house. Phoenix House took control over his finances, forced Plaintiff to pay them first rather than the sex offender treatment provide, and he was no longer able to even call his lawyer, at 50 cents

9

per call.  His sex offender treatment provider terminated him from treatment, in large part, because he was unable to afford to pay for this treatment and the Plaintiff was arrested and charged with technical parole violations a second time in early 2014.  In violation of CRS 17-2-103(5), it was months (many times longer than 10 days) before the Plaintiff was served with a parole revocation complaint. The Defendants failed to schedule the revocation hearing in compliance with CRS 17-2-103(7).

15.    Plaintiff's second parole revocation hearing took place on March 10, 2014, presided over by Defendant Joe Morales.  At this hearing, all the false allegations that the Plaintiff forcibly sodomized his cousins, that he threatened to kill his cousins dog and other family members in order to cast the Plaintiff in a false light that he was "dangerous."  Morales revoked the Plaintiff's parole and sent him to the DOC for a 180 day turnaround.  Morales threatened the Plaintiff that if he was revoked a third time that he would be remanded to the DOC for the rest of his life without the possibility of parole.  Morales refused to acknowledge that the Plaintiff is a brain damaged juvenile offender, and that remanding him to the DOC for the rest of his life without the possibility of parole would be in express violation of *Miller v. Alabama,* 132 S.Ct. 2455 (2012), *Jackson v. Hobbs*, 132 S.Ct. 548 (2012) and *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010). There is no Colorado statute that provides for judicial review of parole board action, and therefore there is no judicial review of a parole revocation proceeding.  Consequently, if the parole board imprisons a juvenile offender, for life without possibility of parole, in violation of *Miller v. Alabama,* 132 S.Ct. 2455

10

(2012), *Jackson v. Hobbs*, 132 S.Ct. 548 (2012) and *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010), there is no way for that juvenile offender to seek relief in the Colorado state courts.

16.     The female stalker who had been harassing the Plaintiff and placing the anonymous calls to his parole officer went to the Phoenix House after March 10, 2014 and falsely represented herself as the Plaintiff's "girlfriend." Without checking her identification or her claim to be authorized to pick up the Plaintiff's possessions, Phoenix House gave this woman the Plaintiff's jewelry (including a crucifix and chain), his watch, his wallet that contained his ID and Social Security Card and an ipod.

17.     The Plaintiff was released from the DOC on July 29, 2014.  He was dropped of at the Denver Reception and Diagnostic Center on Smith Road, without any clothes, money, identification or transportation and was expected to fend for himself and figure out how to get to Ms. Duncan's office.

18.     Ms. Duncan ordered the Plaintiff to live in a dive motel, in an extremely dangerous neighborhood, on East Colfax in a room that is infested with bed bugs and other vermin.  This dive motel is filled with other parolees who are sex offenders and many of them have been robbed, assaulted, had their faces smashed in, bones shattered and been victims of other violent crime because the area is so unsafe.  Parole only paid for this room for two weeks, and then he will be homeless if he cannot obtain a job.  After living in this room for 12 days, the Plaintiff is covered in bed bug bites.  He had no clothes except for one pair of shorts, one pair of socks, no shirts and just one white undershirt/ tank top.

11

He had no money to buy food or clothes, and a pro bono attorney had to bring him food and the small amount of cash that she was saving for him from his 2013 income tax refund. He was allowed to sign up for food stamps, but will not receive any food stamps until later in August at the earliest. Since his wallet was stolen by the stalker, he has no ID and cannot obtain a new one without an original birth certificate, which he does not have and he has no permission to go to the applicable state office to attempt to obtain a replacement.

19. Duncan left a message for the Plaintiff on August 9, 2014 and told him that he could not have contact with any other person, including his parents. His father was going to come over and help him try to get rid of the bed bugs, but now he is not even allowed to speak to his parents on the telephone. Duncan instructed the Plaintiff that he could not go anywhere except the parole office, his sex offender treatment office, the place where he does urinalysis and the office where his ankle monitor was installed. He is not allowed to go anywhere to buy food, personal hygiene products, including Walmart and the Gas Station. He was previously allowed to go grocery shopping twice a week. He is not allowed to work or search for work. He is not allowed to go to a Laundromat to wash his clothes. Duncan instructed him to wash out his clothes in his sink, but there is substandard plumbing in the dive motel and Plaintiff's sink in his room is plugged up. In any event, without soap, or the ability to go buy any soap, the Plaintiff cannot rinse out his clothes in his room.

20. According to Duncan's directives, the Plaintiff will not be allowed to go anywhere else without an approved "safety plan." However, he cannot obtain

12

approval for a "safety plan," except from his treatment provider. His treatment provider will not approve any safety plans until he is enrolled back into treatment, which costs $500 per month that the Plaintiff does not have. The Plaintiff will not be able to afford treatment until he has a job, but Duncan will not let him look for a job without an approved "safety plan." The Plaintiff will be out of food by the end of the week.

21. Duncan's position is that the SOMB standards require that she place these restrictions on the Plaintiff.

**FIRST CLAIM**
**FOR DECLARATORY AND INJUNCTIVE RELIEF pursuant to 42 USC §1983 – For violations of the First, Eighth and Fourteenth Amendments to the US Constitution against all Defendants**

22. The Plaintiff has a First and Fourteenth Amendment right to familial association, on the telephone and in person visitation, with his parents. This First and Fourteenth Amendment right to familial association cannot be restricted simply because the Plaintiff has been designated as a "sex offender" who is not yet in "treatment" (because he cannot afford the "treatment"). The Plaintiff is entitled to an injunction against Duncan prohibiting her from restricting his right to familial association with his parents.

23. Duncan violated the Plaintiff's Eighth Amendment rights by forcing him to live in an insect infested room without adequate plumbing, and by prohibiting him from obtaining food. The Plaintiff is entitled to an injunction against Duncan prohibiting her from continuing to violate his Eight Amendment right to be free from cruel and unusual punishment.

13

24.     If Duncan is required to restrict the Plaintiff's ability to speak to his parents on the telephone or have his parents visit him in his dive motel room by virtue of any policy, standard or guideline promulgated by the Defendant SOMB board members, then the SOMB board members have violated the Plaintiff's First and Fourteenth Amendment rights to free speech and association.  The Plaintiff is entitled to a Declaration that any such policy, standard or guideline violates the First and Fourteenth Amendment and to prospective injunctive relief enjoining the enforcement of any such unconstitutional policy, standard or guideline.

25.     As set forth in *Miller v. Alabama,* 132 S.Ct. 2455 (2012), *Jackson v. Hobbs*, 132 S.Ct. 548 (2012) and *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010), it violates a juvenile offender's Eighth Amendment right to be free from cruel and unusual punishment to sentence a juvenile offender to imprisonment for life without the opportunity for parole.  The Plaintiff is entitled to an injunction against the parole board members enjoining them from remanding him to the DOC for the remainder of his life without the possibility of parole in the future.

26.     The Plaintiff is entitled to attorney fees and costs pursuant to 42 USC §1988.

## SECOND CLAIM
### FOR NOMINAL, COMPENSATORY AND PUNITIVE DAMAGES pursuant to 42 USC §1983 – For violations of the First, Eighth and Fourteenth Amendments to the US Constitution against Jennifer Duncan

27.     Ms. Duncan has damaged the Plaintiff in an amount to be determined at trial for violation of his First and Fourteenth Amendment rights to familial association with his parents, and for violation of his Eighth Amendment

right to be free from cruel and unusual punishment.  The Plaintiff has suffered enormous emotional distress since July 29 by being forced to live in a room without adequate plumbing that is infested with bed bugs such that he is covered in bites, and not even being allowed to go to a convenience store and buy bug spray.  He has suffered enormous emotional distress by being isolated from his parents and other adult family members without a rational or legitimate penological purpose for denying him familial association.

28.    Ms. Duncan acted with actual malice in recklessly infringing upon the Plaintiff's First and Fourteenth Amendment right to familial association with his parents and subjecting the Plaintiff to cruel and unusual punishment by forcing him to live in a dive motel infested with vermin and not allowing him to leave to obtain food.

29.    The Plaintiff is entitled to his attorney fees and costs pursuant to 42 USC 1988.

**The Plaintiff demands a jury trial on the Second Claim for Relief**

**WHEREFORE,** the Plaintiff prays for entry of judgment against the Defendants as follows:  (1)  for nominal, compensatory and punitive damages against Jennifer Duncan; (2) for a declaration against the Defendants in their official capacities that their actions violated the Plaintiff's First, Eighth and Fourteenth Amendment Rights; (3) for an injunction against all the Defendants sued their official capacities to prevent future violations of the Plaintiff's First, Eighth and Fourteenth Amendment rights; (4) for the Plaintiff's attorney fees and costs; and (5) for all other relief that the Court deems just and proper to punish

15

the Defendants' flagrant violation of the United States Constitution and to prevent future violations.

DATED August 12, 2014.

Respectfully submitted,

/s/ Alison Ruttenberg

Alison Ruttenberg
PO Box 19857
Boulder, CO  80308
(720) 317-3834
Fax:  (888) 573-3153
Ruttenberg@me.com

**Attorney for Plaintiff**

Address of the Plaintiff:

Jonathan Shields
Homeless on Colfax Avenue, Denver Colorado

16