IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02231-RM-MEH

JONATHAN SHIELDS,
STEVEN CHRISTIANSEN,
ERIC PETERSEN,
WESLEY SPECHT, and
JESSICA SPECHT,

      Plaintiffs,

v.

JENNIFER DUNCAN, in her individual capacity as Jonathan Shields' parole officer,
THERESA DAWES, in her individual capacity as Steven Christiansen's parole officer,
SHEFALI PHILLIPS, in her official capacity as Eric Petersen's parole officer,
RICK RAEMICSH, in an official capacity as Executive Director of the Colorado DOC,
MARCELO KOPCOW, in an official capacity as SOMB Board Member,
ERIN JEMISON, in an official capacity as SOMB Board Chair,
MARY BAYDARIAN, in an official capacity as SOMB Board Member,
CARL BLAKE, in an official capacity as SOMB Board Member,
ALLISON BOYD, in an official capacity as SOMB Board Member,
A. MERVYN DAVIES, in an official capacity as SOMB Board Member,
CHERYL DAVIES, in an official capacity as SOMB Board Member,
JESSICA CURTIS, in an official capacity as SOMB Board Member,
AMY FITCH, in an official capacity as SOMB Board Member,
JEFF GEIST, in an official capacity as SOMB Board Member,
MISSY GURSKY, in an official capacity as SOMB Board Member,
PEGGY HEIL, in an official capacity as SOMB Board Member,
WILLIAM HILDEBRAND, in an official capacity as SOMB Board Member,
NANCY JOHNSON, in an official capacity as SOMB Board Member,
JEFF JENKS, in an official capacity as SOMB Board Member,
DIANNA LWYER-BROOK, in an official capacity as SOMB Board Member,
TOM LEVERSEE, in an official capacity as SOMB Board Member,
RICHARD BEDNARSKI, in an official capacity as SOMB Board Member,
JOHN ODENHEIMER, in an official capacity as SOMB Board Member,
JESSICA MEZA, in an official capacity as SOMB Board Member,
ANGEL WEANT, in an official capacity as SOMB Board Member,
MIMI SCHEUERMANN, in an official capacity as SOMB Board Member,
DOUG STEPHENS, in an official capacity as SOMB Board Member,
BRANDON SHAFFER, in an official capacity as Colorado Parole Board Member,
REBECCA OAKES, in an official capacity as Colorado Parole Board Member,
DENISE BALAZIC, in an official capacity as Colorado Parole Board Member,
ALFREDO PENA, in an official capacity as Colorado Parole Board Member, and
MARJORIE LEWIS, in an official capacity as Colorado Parole Board Member,

      Defendants.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Michael E. Hegarty, United States Magistrate Judge.**

Before the Court is the Defendants' renewed Motion to Dismiss [filed October 31, 2016; ECF No. 204]. Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR 72.1(c), the motion has been referred to this Court for recommendation. The motion is fully briefed, and the Court finds that oral argument would not materially assist in the adjudication of the matters. For the reasons that follow, this Court respectfully recommends that Defendants' Motion be granted in part and denied in part.[1]

## BACKGROUND

Plaintiffs (above-captioned) assert that the State of Colorado's Sex Offender Management Board's ("SOMB") treatment of sex offenders (incarcerated, paroled or discharged from parole) violates the Plaintiffs' constitutional rights to familial association. Plaintiffs, who are self-described "sex offenders" or family of the same, allege that the SOMB applies a blanket prohibition against any sex offender having any contact with a "victim" or anyone under the age of 18 (even the sex offender's own children and grandchildren), and precludes indirect or third-party contact (so the sex

---

[1] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual and legal findings of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

offender is not allowed to talk to his spouse or adult children about his children or grandchildren).

On October 23, 2015, this Court issued a recommendation that the Honorable Raymond P. Moore grant the Defendants' motion to dismiss the operative Third Amended Complaint ("TAC"). ECF No. 162. In that recommendation, this Court set forth the background of the case. *Id.* Then, in Judge Moore's October 13, 2016 order adopting in part and rejecting in part the recommendation, the judge described a comprehensive, updated background and procedural history of the case. ECF No. 201. Accordingly, the Court need not repeat that information here.

Since Judge Moore's order, the Plaintiff filed a Notice of Voluntary Dismissal of Plaintiffs Kerns, Spitz, and Cooley and Defendants Sage and Tate. ECF No. 216. Accordingly, this Court has modified the case caption and will proceed to determine the claims and defenses of the remaining parties as set forth in the motion and attendant briefing.

## I.    Statement of Facts

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by the Plaintiffs in the TAC.[2]  *See* TAC, ECF No. 102. The Court will address each Plaintiff in turn.

### A.    Jonathan Shields

Plaintiff Shields was a juvenile offender charged as an adult with sex offenses and other felonies in Adams County, Colorado, in 2002. TAC ¶ 18. Shields was a developmentally disabled child who experienced brain damage while riding his bicycle in 2001; the next year, when babysitting his younger cousins and after having been given marijuana by his cousins' father, he was accused of having sexually abused his cousins. *Id.* ¶19. He pled guilty to Fourth Class Felony Sex Assault against a Child and a misdemeanor sex offense in exchange for a deferred sentence. *Id.* ¶

---

[2]The Court here provides only broad facts related to the Motion as the TAC includes 51 pages of facts. *See* TAC, docket #102 at 5-56.

20. He failed to successfully complete the deferred judgment so was sentenced to two years to life in the DOC in 2012. *Id*. Shields was paroled in 2012 after successfully completing sex offender treatment. *Id*. ¶ 21. Defendant Jennifer Duncan was assigned to be Shields' parole officer. *Id*. ¶ 22. Shields used his brother's cell phone to send a text, and that cell phone contained a history of having viewed websites that could be considered pornographic. *Id*. Use of that cell phone along with contact with a family friend who, unbeknownst to Shields, had a felony record led to Duncan's request to rescind his parole, but the request was denied. *Id*.

Shields then again entered sex offender treatment, but the treatment provider terminated him because he could not pay for the service, so Shields was arrested and charged with parole violations. *Id*. ¶¶ 23–24. His parole was then revoked in March 2014 and he returned to the DOC. *Id*. ¶ 25. He was released from the DOC on July 29, 2014 without any clothes, money, identification or transportation and was expected to fend for himself. *Id.* ¶ 27. Duncan told him he was not permitted to go anywhere except the parole office, his sex offender treatment office, the place where he provided urine samples, and the office where his ankle monitor was installed. *Id*. ¶ 29. In addition, Duncan ordered Shields to live in a room at the Carriage Inn, "a dive motel, in an extremely dangerous neighborhood" where he "was covered in bed bug bites" and experienced other squalid conditions. *Id*. ¶ 28. He was also not allowed to have contact with his parents. *Id*. ¶ 29. Duncan's and the parole board's position was that the SOMB standards require that these restrictions be placed on Shields. *Id*. ¶ 30. After the filing of this lawsuit, Duncan removed the restriction that Shields could not have contact with his parents. *Id*.

B.    Steven Christiansen

Plaintiff Christiansen was charged with various sex offenses that allegedly occurred in May 1998. TAC ¶ 33. On June 8, 2004, Christiansen was sentenced to a single count of Fourth Class Felony Sex Assault on a Child. *Id*. He completed his sentence at the DOC and his mandatory

parole, but was required to continue to register as a sex offender. *Id.* ¶¶ 33–34. He has been accused several times of failing to register and, in December 2013, was sentenced to nine months in the DOC after pleading guilty to this charge in Adams County. *Id.* ¶ 34. At the time, Christiansen had a ten-week-old child, but there is no allegation he committed sexually inappropriate conduct against her or anyone else since the 1998 allegations. *Id.*

Upon his parole, Christiansen was not allowed to have contact with any person under the age of 18, including his own child, based on SOMB guidelines. *Id.* Defendant Theresa Dawes served as Christiansen's parole officer and directed that he was prohibited from living with his wife and daughter. *Id.* Christiansen thus was directed by Dawes to live in a Motel 9, "another dive motel in an extremely dangerous neighborhood on East Colfax in a room that is infested with rodents and other vermin," where he experienced uninhabitable conditions. *Id.* ¶ 42. Because of his sex-offender designation, the parole board and Dawes used SOMB standards to prohibit Christiansen from having any verbal or physical contact with his daughter. *Id.* ¶ 44.

C.    Eric Petersen

Plaintiff Petersen was convicted of sex assault on a child and sentenced to two years to life in the DOC in April 2003 for a 1999 offense of kissing and fondling the breast of his roommate's 14-year-old babysitter in Arapahoe County, Colorado. *Id.* ¶ 61. He had volunteered to drive the babysitter home, during which time he allegedly committed the criminal act. *Id.* He received a deferred sentence of four years probation for Sexual Assault on a Child and 12 years probation for Second Degree Kidnapping, with sentences running concurrently. *Id.* While on probation, Petersen moved in with a woman who had a minor child, resulting in Petersen's arrest and loss of his deferred judgment. *Id.* ¶ 62. The woman was, at the time, already pregnant with Petersen's daughter. *Id.* He was resentenced in April 2003 to two years to life in the DOC. *Id.* His daughter was born in May 2003 while he was in prison, and he has not been allowed to meet her. *Id.*

While incarcerated in the DOC, Petersen completed sex offender treatment and participated in treatment for four of the seven years he was incarcerated.  *Id.* ¶ 63. He did not pass required polygraph examinations as required by the SOMB, so he was terminated from DOC treatment.  *Id.* He also has failed 12 polygraph examinations while on parole.  *Id.* ¶ 69.  His parole officer, Defendant Shefali Phillips, determined that SOMB regulations would require Petersen to be placed in community corrections and have his liberty restricted if he continued to fail these polygraph examinations.  *Id.* ¶ 70.  When he was paroled, he was allowed to have four pictures of his daughter but no other contact.  *Id.* ¶ 64.  He also was prohibited from contact with his six nieces and nephews. *Id.* ¶ 65.

    D.    <u>Wesley Specht and Jessica Specht</u>

Plaintiff Specht was a coach at a Jefferson County high school when charged with sex assault on a child by one in a position of trust and other related offenses for allegedly having sexual contact with three teenaged girls at the high school.  TAC ¶ 71.  A jury convicted him of one count of sexual assault on a child by one in a position of trust on a victim who was 17-years-old at the time and "always claimed that the relationship was consensual."  *Id.*  He was sentenced in July 2012 to 12 years to life in DOC.  *Id.*  Specht's conviction is currently on direct appeal.  *Id.*

Specht married his victim, Plaintiff Jessica Specht, when she was 19-years-old via a proxy marriage in which neither was in the presence of the other.  *Id.* ¶ 72.  The DOC has denied Mr. Specht all visitation with his wife and anyone under the age of 18 (*id.* ¶ 74) based on the SOMB policy that "sex offenders may never have any contact with anyone designated as a 'victim' of sexual assault by the offender or contact with anyone who is under the age of 18."  *Id.* ¶ 75.  On March 19-20, 2015, a Specht family friend, Jessica Zanghi, personally talked to Warden Miller at the Crowley County Correctional Facility who told her that Mr. Specht would never be permitted to have visitation with his wife or anyone under the age of 18.  *Id.* ¶ 74.  Mr. Specht has never been

accused of any other sexual impropriety or crime and has never been accused of harming any children other than the children in Jefferson County case number 2011CR965. *Id.* ¶ 76.

## II.  Procedural History

Plaintiffs assert two causes of action against the State Defendants[3]: (1) declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments to the U.S. Constitution for denying rights to familial association; and (2) nominal, compensatory and punitive damages pursuant to 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the U.S. Constitution against the Defendants sued in their personal capacities. TAC, docket #102 at 56, 62.  Plaintiffs confirm in their response brief that the First Claim is brought by Plaintiffs Petersen and the Spechts against the Defendants in their official capacities, and the Second Claim is brought by Plaintiffs Shields and Christiansen against Defendants Duncan and Dawes in their individual capacities.  Resp. 1–3.

In his October 13, 2016 order, Judge Moore rejected this Court's recommendation that Plaintiffs' claims be dismissed for this Court's lack of subject matter jurisdiction pursuant to the *Younger* doctrine and denied the Defendants' motion without prejudice . ECF No. 201.  On October 31, 2016, the Defendants filed the present renewed motion arguing Plaintiff Petersen's First Amendment claim is barred by the statute of limitations; the familial association claims fail to state claims for relief; to the extent Plaintiffs seek declaratory and injunctive relief that is not ripe, the claims fail; and Plaintiffs Shields' and Christensen's Eighth Amendment claims fail to state plausible claims for relief.[4]

---

[3]Judge Moore noted in his order that the TAC's Third and Fourth Claims had been dismissed.  ECF No. 201 at 4 n.5.

[4]Defendants bring their motion pursuant to both Fed. R. Civ. P. 12(b)(1) and 12(b)(6); however, the Court finds Rule 12(b)(1) does not apply for an analysis of the Defendants' arguments.

Plaintiffs counter that Petersen's claim has not yet accrued because the alleged ongoing conduct has not yet ceased or, alternatively, the claim accrued in August 2014, and, thus, the statute of limitations does not bar his claim; under the governing law, the Plaintiffs' familial association claims cannot be resolved in a 12(b)(6) analysis; and, Plaintiffs plausibly state Eighth Amendment claims for deliberate indifference by the individual Defendants.

Defendants reply repeating most of the original arguments and contending Plaintiffs' attempts to add "new" facts in their brief is improper.

## **LEGAL STANDARDS**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678-80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while

the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

The adequacy of pleadings is governed by Federal Civil Procedure Rule 8(a)(2), which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations omitted). Determining whether the allegations in a complaint are "plausible" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the "well pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[ ] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

## ANALYSIS

As set forth above, the Defendants raise the following arguments in support of their request to dismiss the TAC: (1) Petersen's First Amendment claim is barred by the statute of limitations; (2) the Plaintiffs' First Claim fails to state plausible claims for relief; (3) Shields' claim for injunctive relief is not ripe; and (4) Plaintiffs Shields' and Christiansen's Second Claim fails to state plausible claims for relief. The first three arguments address the Plaintiffs' First Claim against the official-capacity Defendants, and the fourth argument addresses the Second Claim against the individual-capacity Defendants. The Court will address each argument in turn.

## I.      Statute of Limitations

"Limitations periods in § 1983 suits are to be determined by reference to the appropriate state statute of limitations and the coordinate tolling rules ...." *Fogle v. Pierson*, 435 F.3d 1252, 1258

(10th Cir. 2006) (quoting *Hardin v. Straub*, 490 U.S. 536, 539 (1989)) (quotations omitted).  The

limitations period applicable to this § 1983 suit is Colorado's two-year statute of limitations which

bars suits filed more than two years after the time the cause of action accrued.  *Id.* (citing *Blake v.*

*Dickason*, 997 F.2d 749, 750–51 (10th Cir. 1993)); *see also* Colo. Rev. Stat. § 13–80–102.  "A §

1983 action 'accrues when facts that would support a cause of action are or should be apparent.'"

*Id.* (quoting *Fratus v. DeLand*, 49 F.3d 673, 674–75 (10th Cir. 1995)).  Dismissal under Fed. R. Civ.

P. 12(b)(6) is proper when a complaint indicates on its face that the statute of limitations has

expired.  *Aldrich v. McCullouch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).

Here, Defendants contend that Petersen's First Amendment claim, originally filed in August

2014, is barred because, "[t]hrough his allegations, Petersen acknowledges that this challenged

restriction [from contact with his minor daughter] has been in place since he paroled in July 2010."

Mot. 4–5.  Petersen counters that the alleged violation has been "ongoing" since he paroled and,

thus, his cause of action has not yet accrued or, alternatively, the claim accrued in August 2014

when an approved safety plan by which Petersen was to have supervised contact with his daughter

was revoked "because he [could] not pass the polygraph examination that he has *not* had any contact

with his daughter."  Defendants reply that "August 2014 safety plan" allegations do not appear in

the operative pleading and cannot be added by a response brief, and the Tenth Circuit has not

recognized a continuing violation theory for § 1983 cases.

A review of the operative TAC reveals that the "August 2014 safety plan" allegations, in

fact, are not included in the pleading.  In the response brief to the present motion, Petersen cites to

his declaration that accompanied the November 16, 2014 Motion for Preliminary Injunction (denied

by Judge Moore May 22, 2015) apparently to demonstrate notice to the Defendants of such

allegations.  *See* Decl. of Eric Petersen ¶ 4, ECF No. 29-3.  However, the declaration was neither

attached to, nor referenced in, the TAC, nor to the Amended Complaint that was operative at the

time.  *See* Am. Compl., ECF No. 27; *see also GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d

1381, 1384 (10th Cir. 1997) (courts may consider outside documents that are both central to the

plaintiff's claims and to which the plaintiff refers in his complaint).  Consequently, Petersen cannot

rely on the "August 2014 safety plan" allegations to demonstrate he is entitled to relief under Fed.

R. Civ. P. 8(a)(2).

As for Petersen's continuing violation theory, the Tenth Circuit has "never formally adopted

the continuing violation doctrine for § 1983 actions."  *Gosselin v. Kaufman*, 656 F. App'x 916, 919

(10th Cir. July 19, 2016).  However, the Tenth Circuit has "concluded that assuming the continuing

violation doctrine applies to § 1983 claims, the doctrine is triggered by continual unlawful acts, not

by continual ill effects from the original violation."  *Mata v. Anderson*, 635 F.3d 1250, 1253 (10th

Cir. 2011) (citations and internal quotation marks omitted).

Petersen's allegations concerning his lack of contact with his daughter since parole include:

[62].    While on probation, Mr. Petersen met Jenny Salzman in February 2002 and
moved in with her in Spring of 2002. In August 2002, Mr. Petersen was arrested and
lost his deferred judgment for . . . being in denial in regards to offense of record, and
entering into a relationship with Jenny Salzman who had a minor child at that time.
However, by this time, Ms. Salzman was pregnant with Mr. Petersen's daughter L.P.
On April 21, 2003, Mr. Petersen was resentenced to two years to life in the DOC.
[His] daughter was born on May 31, 2003 while he was in prison and he has never
even been allowed to meet her, much less parent her or even talk to her.

63.    While incarcerated at the DOC, Mr. Petersen completed SOTMP (sex
offender) treatment, and participated in treatment for a total of four years of the
seven years while incarcerated. However, he had problems passing the required
polygraph examinations required by the SOMB and was terminated from treatment
in the DOC as a result. He filed a federal lawsuit, Petersen v. Dunlap,
08-cv-00668-ZLW-KMT to address the constitutionality of being terminated
specifically from treatment because of failed polygraphs, along with other claims.
The case became moot when Mr. Petersen was paroled on July 1, 2010 and was
enrolled in sex offender treatment in the community.

64.    When Mr. Petersen was paroled, he was allowed to have four pictures of his
daughter, which he still has. This is the only "contact" with his daughter that the
parole board and his parole officer have ever permitted. L.P. has Asperger's
syndrome and it has been very difficult for Ms. Salzman to raise L.P. as a single

parent; she is in favor of Mr. Petersen being able to participate in L.P.'s life and share in the parenting duties. All Mr. Petersen can do to support Ms. Salzman and L.P. is to pay child support, which he has done ever since he was paroled.

* * * *

69.     Mr. Petersen continues to have difficulty passing polygraph examinations. He has failed twelve polygraphs while on parole, and the only polygraph examination he ever passed was an issue specific polygraph examination he took when he returned from Idaho for his grandmother's funeral. He was asked whether he had any contact with minors while on this furlough, and the polygraph test results were non deceptive. In the twelve polygraph examinations he has failed, the polygrapher alleges that he produced deceptive results when asked whether he has had contact with his daughter, or has had sexual contact with minors. He has engaged in neither behavior since his incarceration in 2003 and has never met his daughter or spoken to her on the telephone.

TAC, ECF No. 102.  These allegations fail to identify any discrete act taken by the Defendants, except that they have denied him the ability to see his daughter upon his parole in July 2010. Although Petersen alleges he has "failed twelve polygraphs while on parole," he does not link the polygraph tests to the Defendants' affirmative refusal to permit him to associate with his daughter or other minor children;[5] rather, the allegations can be construed as referring to polygraph tests given as part of Petersen's parole conditions.  Even if he had provided such link, however, Petersen provides no dates by which the Court might discern whether his claim is timely.

Therefore, the Court concludes that even if the continuing violation doctrine were properly applied to § 1983 claims in this Circuit, Petersen has failed to demonstrate Defendants' "continual unlawful acts" as opposed to "continual ill effects from the original violation." *Mata*, 635 F.3d at 1253.  The Court respectfully recommends that Judge Moore grant the motion to dismiss the First Claim for Relief as it pertains to Petersen.

## II.     Failure to State the First Claim for Relief

---

[5]For example, Petersen does not allege that Defendants required he pass a polygraph test before they would permit him to contact his daughter, or that the polygraph tests were required by statute or regulation pertaining to his contact with minor children.

Defendants argue that Plaintiffs Wesley and Jessica Specht's familial association claims fail because (1) their claims are the same or similar to that dismissed in *Wirsching v. Colo.*, 360 F.3d 1191, 1201 (10th Cir. 2004), and (2) they fail to allege that by administering the subject policy prohibiting visitation by a victim with an incarcerated sex offender, the CDOC intends to interfere with the husband/wife relationship. Plaintiffs counter that Mrs. Specht is now an adult and Mr. Specht is "no longer in a position of trust" and they have since decided to marry; accordingly, Mrs. Specht is no longer a "victim" and the policy as applied to the Spechts is not reasonably related to legitimate penological interests. Defendants reply repeating their contention that the allegations fail to reveal any "intent" to interfere.

To state a claim for the deprivation of the right of familial association, the Plaintiffs must allege that (1) Defendants intended to deprive them of their protected relationship with each other, and that (2) balancing the Plaintiffs' interest in their protected relationship against the state's interests in protecting victims and maintaining a secure facility, Defendants either unduly burdened Plaintiffs' protected relationship, or effected an "unwarranted intrusion" into that relationship. *Thomas v. Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014) (citations omitted). In conducting this balancing, the court will consider, among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action. *Id.*

With respect to this claim, the Plaintiffs allege:

72. Mr. Specht's "victim" is now his wife, Jessica Specht. On July 13, 2012, the date Mr. Specht was sentenced, the Jefferson County District Court vacated the protection order prohibiting contact between Mr. Specht and Jessica. She went to visit him twice in the county jail before he was transferred to the DOC. They were married on March 27, 2013 when she was nineteen years old. Mr. Specht just turned 30 years old. Colorado allows marriage by proxy, and therefore the parties to a marriage do not need to be in the same room in order to become legally married.

73. Mr. Specht's sister Megan Lee Boozer is two years older than Mr. Specht and

is the mother of Mr. Specht's niece and nephew born in 2005 and 2013. Jessica and Zachary Zanghi are long time friends of Mr. Specht. They are the parents of two children born in 1998 and 2003, and these children grew up knowing Mr. Specht.

74.    The Colorado DOC has denied Mr. Specht all visitation with his wife and any other person under the age of eighteen including Mr. Specht's niece and nephew and the Zanghi children. Mr. Specht and his family and Ms. Zanghi filed grievances and other inquiries regarding the denial of visitation. Mr. Specht is incarcerated at Crowley County Correctional Facility, and the Warden of that facility at all material times was Warden Miller, and the Mental Health Director was Don Plagge. Mr. Specht's application for visitation with his wife, other family members and the Zanghi children was submitted to Dan Plagge in October 2013. Mr. Plagge submitted the application to the DOC visitation committee, but his application was denied.  On March 19 and 20 Jessica Zanghi personally talked to Warden Miller who told her that Mr. Specht would never be permitted to have visitation with his wife or anyone under the age of 18. Mr. Specht has exhausted all administrative remedies that are reasonably available, and given Warden Miller's directives any attempts to resolve this dispute administratively is futile.

TAC, ECF No. 102.[6]  For the first prong of the analysis, the Court concludes that Plaintiffs' allegations plausibly state an intent to interfere with the Spechts' marriage relationship.  That is, a reasonable fact finder could conclude that the warden of Crowley County Correctional Facility, Warden Miller, after speaking with Specht's close friend, Mrs. Zanghi, about the circumstances[7] and informing her that Specht "would never be permitted to have visitation with his wife," specifically intended to, or with conscious disregard to Plaintiffs' rights did, interfere with the husband/wife relationship.  *See Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1175–76 (10th Cir. 2013) (citing *Bryson v. City of Edmond*, 905 F.2d 1386, 1393–94 (10th Cir. 1990)).

---

[6]After a lengthy description of the Tenth Circuit's opinion in *Wirsching*, *supra*, Defendants argue, "Plaintiffs' claims regarding the visitation with minor[s] fails [sic]."  Mot. 8.  Plaintiffs' response does not address this argument with respect to Mr. Specht; therefore, the Court concludes Specht has abandoned his claim concerning visitation with his niece and nephew. Even if he had not done so, the Court finds that Plaintiffs' allegations do not plausibly state the Defendants intended to interfere with Specht's relationship with his niece and nephew and, thus, to the extent necessary, recommends that Judge Moore grant the motion to dismiss Specht's claims concerning his niece and nephew.

[7]There is no indication in the TAC that Mrs. Zanghi spoke with Warden Miller about Specht's visitation with minor children other than her own, who are not Specht's family members.

Under the second prong, the Court finds the allegations plausibly state a "burden" or "unwarranted intrusion" into the relationship considering the interests of the parties.  Regarding the severity of the infringement, Plaintiffs allege the Defendants have "denied Mr. Specht *all* visitation with his wife."  TAC ¶ 74 (emphasis added).  The Spechts have been married nearly four years, since March 27, 2013.  The Court finds such denial severe.  *See Boddie v. Conn.*, 401 U.S. 371, 376, 383 (1971) ("marriage involves interests of basic importance in our society" and is "a fundamental human relationship").

Certainly, a state's interest in protecting sexual offense victims and maintaining a secure facility are important.  But, here, where (allegedly) the victim is now a 23-year-old adult and the offender's wife, the Defendants' need to protect her diminishes.  Additionally, the Defendants have not identified how the facility's security would be affected by allowing in-person visits between the Spechts.

Finally, the Court can perceive of no reasonable alternative courses of action that might substitute for in-person visits between the Spechts.  Defendants contend that "[o]ffenders do not have a constitutional right to *contact* visits."  Mot. 6.  However, it does not appear that Plaintiffs here are challenging the application of a policy concerning "contact" visits, but rather *any* in-person visits.  TAC ¶¶ 74, 94.

Therefore, the Court finds Plaintiffs Wesley and Jessica Specht state plausible claims that application of Administrative Regulation (AR) 300-01(IV)(B)(4)(f) interferes with their rights to familial association, and recommends that Judge Moore deny Defendants' motion to dismiss the First Claim for Relief as it pertains to the Spechts.

## III.   Shields' First Claim Not Ripe

The Court notes at the outset the confusion arising from Plaintiffs' response brief in which they first state, "The only claim[s] that Plaintiffs Steven Christensen and Jonathan Shields still have

are their Eighth Amendment claims for damages against their parole officers. Their claims for prospective injunctive relief for denial of their right to familial association are moot." Resp. 1. Plaintiffs then proceed to argue that "Mr. Shield's [sic] claim for injunctive relief against the parole board is ripe for review." *Id.* at 16–18. However, the Defendants do not note this inconsistency and argue Shields' claim is not ripe for review. Reply 6–7.

With respect to this claim, Shields alleges:

25.    Mr. Shields' second parole revocation hearing took place on March 10, 2014, presided over by Defendant Joe Morales. At this hearing, all the false allegations that Mr. Shields forcibly sodomized his cousins, that he threatened to kill his cousins dog and other family members in order to cast Mr. Shields in a false light that he was "dangerous." Morales revoked Mr. Shields' parole and sent him to the DOC for a 180[-] day turnaround. Morales threatened Shields that if he was revoked a third time that he would be remanded to the DOC for the rest of his life without the possibility of parole. Morales refused to acknowledge that Shields is a brain damaged juvenile offender, and that remanding him to the DOC for the rest of his life without the possibility of parole would be in express violation of *Miller v. Alabama*, 132 S.Ct. 2455 (2012), *Jackson v. Hobbs*, 132 S.Ct. 548 (2012) and *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010). There is no Colorado statute that provides for judicial review of parole board action, and therefore there is no judicial review of a parole revocation proceeding. Consequently, if the parole board imprisons a juvenile offender, for life without possibility of parole, in violation of *Miller v. Alabama*, 132 S.Ct. 2455 (2012), *Jackson v. Hobbs*, 132 S.Ct. 548 (2012) and *Graham v. Florida*, 130 S.Ct. 2011, 2030 (2010), there is no way for that juvenile offender to seek relief in the Colorado state courts.

TAC, ECF No. 102.

Notwithstanding Plaintiffs' argument that Shields is "in imminent danger of harm," the Court agrees with Defendants that Shields' claim seeking "an injunction against the parole board members enjoining them from remanding him to the DOC for the remainder of his life without the possibility of parole *in the future* without first giving him procedural due process and an individualized sentencing hearing" (TAC ¶ 96 (emphasis added)) is not ripe for review. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Tex. v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union*

*Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).  In fact, in a case cited by the Plaintiffs, the Tenth Circuit held "a person alleging that he *has been deprived* of his right to procedural due process must prove two elements . . . ." *Couture v. Bd. of Educ. of Albuquerque Pub. Schs.*, 535 F.3d 1243, 1256 (10th Cir. 2008) (emphasis added).  The Court cannot issue an injunction based on speculative future events.

Therefore, the Court finds Shields has failed to state a plausible claim for violation of his Fourteenth Amendment procedural due process right and recommends that Judge Moore grant the Defendants' motion to dismiss the First Claim for Relief as it pertains to Shields.

## IV.   Failure to State Second Claim for Relief

For this claim asserted by Shields and Christiansen against the individual Defendants, Duncan and Dawes, the Defendants assert qualified immunity from such claims.  Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "It is an entitlement not to stand trial or face the other burdens of litigation." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). "The privilege is an immunity from suit rather than a mere defense to liability." *Id.*

Qualified immunity is designed to shield public officials and ensure "that erroneous suits do not even go to trial." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Consequently, courts should address the qualified immunity defense at the earliest possible stage in litigation. *Medina v. Cram*, 252 F.3d 1124, 1127-28 (10th Cir. 2001); *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).

When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "The plaintiff must demonstrate on the facts alleged both that the defendant violated his

constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009)). The Supreme Court affords courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 232-35; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

Here, the Court will analyze first whether Shields and Christiansen state plausible Eighth Amendment violations and, if they do, the Court will consider next whether the Plaintiffs' Eighth Amendment rights were clearly established at the time of the alleged conduct.

A.   <u>Legal Standards for Eighth Amendment Violations</u>

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions of confinement guided by 'contemporary standards of decency.'" *Penrod v. Zavaras*, 94 F.3d 1399, 1405 (10th Cir. 1996) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)).  Accordingly, prison officials must "ensur[e] inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and ... tak[e] reasonable measures to guarantee the inmates' safety."  *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)).  Prisoners state a claim of cruel and unusual punishment under the Eighth Amendment by alleging prison officials demonstrated "deliberate indifference to a prisoner's serious illness or injury," <u>or</u> that prison officials "have, with deliberate indifference," involuntarily exposed a prisoner to conditions "that pose an unreasonable risk of serious damage to [the inmate's] future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993);  *Estelle,* 429 U.S. at 105.  Here, the Plaintiffs allege the latter, commonly referred to as a "conditions of confinement" claim.

The Eighth Amendment requires prison officials to maintain "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  As in all Eighth Amendment claims,

to show a violation of this requirement a prisoner must show an objective component and a subjective component. *Id.* First, he must show that the conditions of confinement posed a "substantial risk of serious harm" to inmate health or safety. *Id.* at 834. To satisfy this prong, a prisoner must show that the conditions were more than uncomfortable. *Id.*

Second, the prisoner must show that officials acted with a "deliberate indifference" to the risk. *Id.* The subjective prong requires a showing that the officials were actually aware of the risk and that they failed to take "reasonable measures to abate it." *Id.*

An inquiry into conditions of confinement necessarily relies on the particular facts of each situation. *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001). The "circumstances, nature, and duration" of the challenged conditions must be considered, with no single factor controlling the outcome. *Id.* ("the length of exposure to the conditions is often of prime importance"). "In general, the severity and duration of deprivations are inversely proportional, so that minor deprivations suffered for short periods would not rise to an Eighth Amendment violation, while substantial deprivations of shelter, food, drinking water, and sanitation may meet the standard despite a shorter duration." *Id.*

### B. Do Plaintiffs State Eighth Amendment Violations?

For their Eighth Amendment claims, Shields and Christiansen allege that their respective parole officers, Duncan and Dawes, required them to stay in unclean, rodent- and insect-infested motel rooms while on parole. Defendants argue the "Plaintiffs fail to allege that either of these defendants had any control over the [motels'] conditions or had any authority to change the locations." Mot. 14. Plaintiffs counter that Shields was "imprisoned" in a filthy, vermin infested room at the Carriage Inn on East Colfax Avenue in Denver from July 29 to August 21, 2014 with no ability to keep food fresh or bathe himself; Christiansen was "imprisoned" under similar circumstances at the Motel 8 on East Colfax Avenue. Plaintiffs interpret Defendants' arguments as

challenging the "deliberate indifference" prong of an Eighth Amendment claim and contend the pleadings and motions in this case demonstrate Defendants' knowledge of the conditions. Defendants reply that the TAC does not include the allegations Plaintiffs now present to show deliberate indifference and, since the TAC is silent, Plaintiffs' claims must fail.

In the TAC, Plaintiffs allege the following for their Eighth Amendment claims:

26.     The female stalker who had been harassing Mr. Shields and placing the anonymous calls to his parole officer went to the Phoenix Center after March 10, 2014 and falsely represented herself as Mr. Shields' "girlfriend." Without checking her identification or her claim to be authorized to pick up Mr. Shields' possessions, Phoenix Center gave this woman Mr. Shields' jewelry (including a crucifix and chain), his watch, his wallet that contained his ID and Social Security Card and an ipod.

27.     Mr. Shields was released from the DOC on July 29, 2014. He was dropped of at the Denver Reception and Diagnostic Center on Smith Road, without any clothes, money, identification or transportation and was expected to fend for himself and figure out how to get to Ms. Duncan's office.

28.     Ms. Duncan ordered Mr. Shields to live in the Carriage Inn, a dive motel, in an extremely dangerous neighborhood, on East Colfax in a room that was infested with bed bugs and other vermin. This Carriage Inn is filled with other parolees who are sex offenders and many of them have been robbed, assaulted, had their faces smashed in, bones shattered and been victims of other violent crime because the area is so unsafe. After living in this room for three weeks, Mr. Shields was covered in bed bug bites. He had no clothes except for one pair of shorts, one pair of socks, no shirts and just one white undershirt/ tank top. He had no money to buy food or clothes, and a pro bono attorney had to bring him food and the small amount of cash that she was saving for him from his 2013 income tax refund. Since the Phoenix Center recklessly allowed the stalker to steal his wallet, he had no ID when he was released on parole and cannot obtain a new one without an original birth certificate, which he does not have and he had no permission to go to the applicable state office to attempt to obtain a replacement. The bed bug bites were clearly visible, and anyone with normal vision, such as Ms. Duncan, could clearly see the bed bug bites. Additionally, Mr. Shields repeatedly told Ms. Duncan on or before August 9, 2014 about the problems with his room in the Carriage Inn mot[el] (that it was infested with bed bugs, that the plumbing was broken so he had no hot water and could not shower because the tub would not drain and he would get his ankle monitor wet, that his sink was clogged, that he was not given clean linens, that he had no way to clean the bedbugs off of his clothes and line[n]s, that he had no way to keep fresh food in his room because the refrigerator was broken and filthy and the room was filthy and had a nasty odor). However, Ms. Duncan ignored these [complaints], told Mr. Shields that he was not allowed to go anywhere else to eat and had to buy food to eat

in his room that he had to wash his clothes in the "sink" (despite the fact it was clogged and there was no hot water), and also told him that he was required to stay in the Carriage Inn because all Adams County parolees were required to reside at the Carriage Inn if they were paroled homeless. . . .

29.     Ms. Duncan left a message for Mr. Shields on August 9, 2014 and told him that he could not have contact with any other person, including his parents. His father was going to come over and help him try to get rid of the bed bugs, but now he is not even allowed to speak to his parents on the telephone. Duncan instructed Mr. Shields that he could not go anywhere except the parole office, his sex offender treatment office, the place where he does urinalysis and the office where his ankle monitor was installed. He was not allowed to go anywhere to buy food, personal hygiene products, including Walmart and the Gas Station. He was previously allowed to go grocery shopping twice a week. He was not allowed to work or search for work. He was not allowed to go to a Laundromat to wash his clothes. Duncan instructed him to wash out his clothes in his sink, but there is substandard plumbing in the dive motel and Mr. Shields' sink in his room was plugged up. In any event, without soap, or the ability to go buy any soap, Mr. Shields could not rinse out his clothes in his room.

30.     . . . After Mr. Shields filed the Complaint in this case on August 12, 2014 and filed a motion for a preliminary injunction on August 13, 2014[,] [t]he Court set a hearing on the Motion for Preliminary Injunction several days later, and then Ms. Duncan dramatically changed her position. On or about August 21, 2014 Ms. Duncan removed the restriction that Mr. Shields could not see or talk to his parents. She gave him permission to make additional trips to the Grocery Store and to go visit his parents at their house. Mr. Shields went to his parents' house and was able to clean up with hot water and wash his clothes. On Monday August 24, 2014, Ms. Duncan had found other housing for Mr. Shields. . . .

* * * *

34.     The only restriction placed on Mr. Christiansen after his discharge from parole was to continue to register as a sex offender. He has been accused several times of failing to do so, and on December 3, 2013 (about 10 weeks after the birth of his daughter), he was sentenced to nine months DOC after pleading guilty to failing to register in Adams County District Court case number 2013CR1049. There is no allegation whatsoever that Mr. Christiansen ever committed an offense or was sexually inappropriate against his daughter, any other family member or anyone else since the 1998 allegations. Pursuant to the definition of "sex offense" in CRS 16-11.7-102(3), failure to register is not considered a "sex offense." However, pursuant to the SOMB Guidelines and CRS 16-11.7-102(1) and (2)(a) since Mr. Christiansen was convicted of a sex offense listed in CRS 16-11.7-102(3) pursuant to a prior conviction, he can still be designated as a "sex offender" and subject to the SOMB Guidelines for the treatment and monitoring of sex offenders while he was on parole. Therefore, upon his parole, Mr. Christiansen was subjected to the one sized fits all SOMB Guidelines which provide that no sex offender may have contact

with any person under the age of 18, even their own children. Ms. Dawes directed that Mr. Christiansen was prohibited from living in his own home with his wife and daughter, and therefore Mr. Christiansen was paroled as homeless.

* * * *

42.     Ms. Dawes ordered Mr. Christiansen to live in the Motel 9, from September 9 - October 7, 2014, another dive motel in an extremely dangerous neighborhood on East Colfax in a room that is infested with rodents and other vermin. This dive motel is filled with other parolees who are sex offenders and many of them have been robbed, assaulted, had their faces smashed in, bones shattered and been victims of other violent crime because the area is so unsafe. Mr. Christensen is indigent and homeless, unable to live with or even talk with his wife. He has very limited money for food. At Motel 9, what food he did have would be contaminated by the mice or rats that live in the motel. His Ramen noodles would be ripped open and partially eaten. He could not afford to have to throw away this food, and he often went hungry. He was ordered to stay in his room and not leave without the permission of Ms. Dawes. He ran out of his bipolar medication, such as lithium and welbutran [sic]. Ms. Dawes refused to give him permission to have his medications refilled and told him that he was using mental illness as an "excuse." Mr. Christiansen repeatedly informed Ms. Dawes that there were rodent feces in his boxspring mattress which the Motel 9 refused to clean up or give him a mattress that was not infested with vermin. The heat did not work. The bathroom did not have operational plumbing and Mr. Christiansen was forced to use another inmate's bathroom down the hall. Motel 9 refused to supply him with a topsheet, and all he was given was a filthy bottom sheet (with no way to wash it) to cover over the vermin and feces infested mattress. However, Ms. Dawes ignored his complaints. The window was broken and taped over. Most mornings, Mr. Christiansen was able to take pictures of dead mice in his room with his cell phone. Motel 9 management refused to clean up the rodents or call an exterminator. Every time Mr. Christiansen tried to complain to the Motel 9 manager, he was threatened with being tattled on to his parole officer for some non existent infraction. Mr. Christiansen did not commit any offense or parole violation while forced to live at Motel 9; instead, the Motel 9 management was extorting his silence by threatening to make false complaints to his parole officer.

43.     On or about October 7, 2014, Ms. Dawes informed Mr. Christiansen that he would have to start paying $245 a week for the motel room at Motel 9 or face revocation and go back to the DOC. He cannot afford to pay that fee plus the cost of housing for his wife and daughter. On October 13, 2014 Mr. Christiansen was allowed to move in with other family members in Commerce City but not his wife. Therefore, he endured five months [sic] of imprisonment in the vermin infested Motel 9. On October 22, 2014 Misty Christiansen and the baby had to move into a homeless shelter in Aurora. If they were allowed to live with Mr. Christiansen in Commerce City, they would not have been homeless.

TAC, ECF No. 102.

First, it is well-settled that an offender "on parole" remains in the custody of the state. *See Maleng v. Cook*, 490 U.S. 488, 491 (1989) (citing *Jones v. Cunningham*, 371 U.S. 236 (1963)) ("a prisoner who had been placed on parole was still 'in custody' under his unexpired sentence" because his "release from physical confinement under the sentence in question . . . was explicitly conditioned on his reporting regularly to his parole officer, remaining in a particular community, residence, and job, and refraining from certain activities." ). There is no dispute that the allegations reflect Duncan and Dawes were acting in their capacities as "parole officers" while engaging in the alleged unconstitutional conduct. Accordingly, to the extent Defendants argue they had ***no*** control over where the Plaintiffs were housed while on parole, such argument is not persuasive.

The Court concludes that Plaintiffs plausibly allege their conditions of confinement at the motels posed a "substantial risk of serious harm" to their health. First, Shields, allegedly developmentally disabled, was "ordered" by Duncan to refrain from contacting his parents and to live at the Carriage Inn for nearly four weeks in a room infested with bed bugs, no hot water, clogged drains, dirty linens, and a broken refrigerator, such that he could not clean himself or his clothes or linens, suffered multiple bedbug bites, and was able to eat only "junk" food that required no refrigeration. Shields' only clothes were a tank top and a pair of shorts. In addition, Duncan instructed Shields that he could go nowhere except the parole office, his sex offender treatment office, the place where his urinalyses were performed, and the office where his ankle monitor was installed; thus, he could not go to a store to purchase healthier food and/or soap or to a laundromat to clean his clothes/linens. Under such conditions where Shields was forced to live in unclean clothes and stay in a filthy, infested room for nearly four weeks, the Court finds Shields' allegations meet the objective prong of an Eighth Amendment claim.

Similarly, Christiansen (indigent and homeless because he was not allowed contact with his wife) was ordered by Dawes to live in the Motel 9 from September 9 - October 7, 2014. Dawes

ordered Christiansen to stay in his room and not leave without her permission.  In his room, his food was repeatedly contaminated by mice or rats; for example, his Ramen noodles were ripped open and partially eaten, but he could not afford to throw away this food and he often went hungry.  He ran out of his bipolar medication, Lithium and Wellbutrin, but Dawes refused to permit him to have his medications refilled and told him that he was using mental illness as an "excuse."  The heat did not work, the window was broken and taped over, and the bathroom did not have operational plumbing so Christiansen was forced to use another inmate's bathroom down the hall. Christiansen repeatedly informed Dawes that there were rodent feces in his mattress, which the motel management refused to clean up or replace with a clean mattress; moreover, the motel refused to supply him with a topsheet, and all he was given was a filthy bottom sheet (with no way to wash it) to cover over the mattress.  Most mornings, Christiansen took pictures of dead mice in his room with his cell phone, but the motel management refused to clean up the rodents or call an exterminator. Every time Christiansen complained to the motel's manager, the manager "extorted" his silence by threatening to make false complaints to his parole officer.  The Court concludes these allegations plausibly state a claim for failure to "provide humane conditions of confinement" and to "ensur[e] inmates receive the basic necessities of adequate food, clothing, [and] shelter."  *DeSpain*, 264 F.3d at 974.

The Court also concludes that Plaintiffs' allegations plausibly state the second prong of an Eighth Amendment claim: that Defendants were actually aware of the risk of harm and failed to take "reasonable measures to abate it." *Farmer*, 511 U.S. at 834.  Shields alleges that he "repeatedly told Ms. Duncan on or before August 9, 2014 about the problems with his room in the Carriage Inn mot[el]" but she "ignored these [complaints], told Mr. Shields that he was not allowed to go anywhere else to eat and had to buy food to eat in his room[,] that he had to wash his clothes in the 'sink' (despite the fact it was clogged and there was no hot water), and also told him that he was required to stay in the Carriage Inn because all Adams County parolees were required to reside at

the Carriage Inn if they were paroled homeless." TAC ¶ 28.  It was not until after Shields filed the

present action that Duncan "removed the restriction that Mr. Shields could not see or talk to his

parents," "gave him permission to make additional trips to the Grocery Store and to go visit his

parents at their house," and "found other housing for Mr. Shields." *Id.* ¶ 30.  These allegations both

rebut Defendants' contention that "Plaintiffs fail to allege ... these defendants had any control over

the conditions or had any authority to change the locations" (Mot. 14) *and* support Shields' claim

that Duncan was aware of the squalid conditions and failed to abate them.

Likewise, Christiansen alleges he "repeatedly informed Ms. Dawes" of the rodents, the feces-

infested mattress, the lack of heat and operational plumbing, and the dirty linens, but she "ignored

his complaints." TAC ¶ 42.  Then, after nearly four weeks, Dawes required that Christiansen start

paying $245/week to live in the motel or face revocation of his parole.  *Id.* ¶ 43.  Finally, "on

October 13, 2014 Mr. Christiansen was allowed to move in with other family members in Commerce

City." *Id.*  The Court finds these allegations reveal Dawes was aware of the conditions of

Christiansen's confinement for several weeks, but failed to abate them.

Accordingly, the Court finds the Plaintiffs' allegations plausibly state violations of Shields'

and Christiansen's Eighth Amendment rights against Duncan and Dawes.

C.  <u>Were Plaintiffs' Eighth Amendment Rights Clearly Established?</u>

To overcome Duncan's and Dawes' defense of qualified immunity, the Plaintiffs' rights

alleged to have been violated must have been clearly established in the law at the time of the alleged

violation. *Pearson*, 555 U.S. at 232.  For a constitutional right to be clearly established, its contours

must be "sufficiently clear that a reasonable official would understand that what he is doing violates

that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  A plaintiff demonstrates that a constitutional

right is clearly established by referring to cases from the Supreme Court, the Tenth Circuit, or the

weight of authority from other circuits. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).

The Court finds that the right to be free from cruel and unusual punishment by preventing lengthy exposure to inadequate heating, bedding, plumbing, and hygiene was clearly established in *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981) (the Eighth Amendment requires that a state "provide within [an inmate's] living space reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (i.e., hot and cold water, light, heat, plumbing).").

Furthermore, the Tenth Circuit has concluded that "the constitutional prohibition against allowing an inmate to remain in a cell rendered hazardous by pervasive infestations of pests was clearly established in December 2007." *Benshoof v. Layton*, 351 F. App'x 274, 279 (10th Cir. Oct. 27, 2009) (citing *Ramos*, *DeSpain*, and *McBride v. Deer*, 240 F.3d 1287, 1291–92 (10th Cir. 2001)). In *Benshoof*, the Tenth Circuit noted that "a high degree of factual similarity is not required to conclude that the law was clearly established," explaining that the Supreme Court's opinion in *Hope*, 536 U.S. at 741, "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Id.* at 278 (citing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007)).

Here, although the facts of this case are not precisely the same as those in *Ramos*, *DeSpain*, and *McBride*, these cases put Defendants on fair notice that ordering parolees to be housed in pest-infested, dirty rooms with inadequate heating, plumbing, bedding, and hygienic materials is unconstitutional. Accordingly, at this stage of the proceeding, the Court finds the Defendants Duncan and Dawes are not entitled to qualified immunity and, thus, the Court recommends that Judge Moore deny the Defendants' motion to dismiss the Second Claim for Relief brought by Shields and Christiansen against Defendants Duncan and Dawes.

## CONCLUSION

Accordingly, based on the foregoing and the entire record herein, this Court respectfully recommends that the Defendants' renewed Motion to Dismiss [filed October 31, 2016; ECF No. 204] be **granted in part and denied in part** as follows:

1.      Grant the motion to dismiss the First Claim for Relief brought by Plaintiffs Petersen and Shields against the official-capacity Defendants;

2.      Deny the motion to dismiss the  First Claim for Relief brought by Plaintiffs Wesley and Jessica Specht against the official-capacity Defendants; and

3.      Deny the motion to dismiss the Second Claim for Relief brought by Plaintiffs Shields and Christiansen against Defendants Duncan and Dawes.

Entered and dated at Denver, Colorado, this 6th day of February, 2017.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge